UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN CONSUMER CREDIT COUNSELING, INC., | * * * |
| Plaintiff, | * * |
| v. | * Civil Action No. 16-cv-12170-IT * |
| AMERICAN CONSUMER CREDIT, LLC, | * * |
| Defendant. | * |

MEMORANDUM & ORDER

April 27, 2017

TALWANI, D.J.

Plaintiff American Consumer Credit Counseling, Inc.'s Motion for Preliminary Injunction [#6] asks the court to enjoin Defendant American Consumer Credit, LLC's use of the marks: "American Consumer Credit"; "American"; "ACC"; and any other marks confusingly similar to Plaintiff's "American Consumer Credit Counseling" and "ACCC" marks. Although this is a close case, for the reasons that follow, Plaintiff's Motion for Preliminary Injunction [#6] is DENIED.

I.  Background[1]

Plaintiff, a Massachusetts non-profit incorporated in 1992, provides confidential counseling regarding credit, debt, housing, bankruptcy, student loans, and financial education. Pl.'s Mem. Supp. Prelim. Inj. ("Pl.'s Mem. Supp.") 9 [#7]. Plaintiff "has clients in every state, is authorized to do business in all 50 states, and is specifically licensed to provide debt

---

[1] For purposes of the motion, the court accepts as true well-pleaded allegations in the complaint and uncontroverted affidavits. Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976).

management services in every state that requires such a license." Id. at 9-10. Plaintiff has helped over 560,000 people in its twenty year history, including 55,000 in 2015 alone. Decl. Steven Trumble Supp. Pl.'s Mot. Prelim. Inj. ("Trumble Decl.") ¶ 5 [#7-1]. Plaintiff owns Federal Registration Nos. 3,253,648 for "American Consumer Credit Counseling," and 2,366,063 for "ACCC." Compl. ¶ 22 [#1]. Both registrations are for "credit and debt inquiry and consultation services, debt and credit counseling; debt repayment planning and scheduling; debt consolidation services; educational services, namely conducting seminars, workshops, and individual instruction in the field of credit, debt, and money management." Id. Since 1992, Plaintiff has provided services in connection with these marks. Id.

Defendant is a Florida limited liability corporation formed by Dana Micallef in 2013. Decl. Dana Micallef Supp. Def.'s Opp'n Pl.'s Mot. Prelim. Inj. ("Micallef Decl.") ¶ 13 [#22]. Nine years prior to forming Defendant, Micallef began operating a business in Florida under the fictitious name American Consumer Credit. Id. ¶ 3. Micallef provided counseling and advice to consumers regarding timeshare obligations and "to consumers struggling with debt or facing problems with their credit," and referred customers to credit counseling agencies in exchange for a referral fee. Suppl. Decl. Dana Micallef Supp. Def.'s Opp'n Pl.'s Mot. Prelim. Inj. ("Suppl. Micallef Decl.") ¶ 2 [#45].

Beginning in 2007, Micallef adopted a second fictitious name – A Debt Consolidation Company – for providing "advice and counseling with respect to financial matters." Id. ¶ 5. In 2009, Micallef started operating under a third fictitious name, AAA Debt Consolidation, and temporarily stopped operating his business under the name "American Consumer Credit" when that fictitious name expired. Id. ¶¶ 4-5.

2

Between 2011 and 2012, Micallef operated under all three fictitious names, despite the 2009 expiration of the fictitious name registration for "American Consumer Credit." Id. ¶¶ 5, 8. In 2012, Micallef also founded two non-profit corporations focused on assisting individuals with their timeshare obligations. Id. ¶ 9-10. Those companies were registered as Florida Resale Recovery, Inc., and American Consumer Services, Inc. Id. American Consumer Services, Inc., launched a website in August 2012 with the domain name "consumeraide.org." Id. ¶ 11. The website featured the name "American Consumer Credit" and stated that "American Consumer Services" was a "subsidiary" of "American Consumer Credit." Id. In early 2013, Micallef stopped operating these non-profit companies. Id. ¶ 12. The consumeraide.org website was maintained through August 1, 2016, when the registration expired and the website was taken down. Id.

Meanwhile, after learning that the domain name "www.americanconsumercredit.com" was unavailable, Micallef selected, and on January 7, 2013, registered, the name "aconsumercredit.com." Def.'s Opp'n Mot. Prelim. Inj. ("Def.'s Opp'n") 8 [#20]; Micallef Decl. ¶ 12 [#22]. Micallef formed Defendant two weeks later. Micallef Decl. ¶ 13. Defendant uses the aconsumercredit.com domain and offers advice to families and individuals seeking to cancel their timeshare obligations. Def.'s Opp'n 5 [#20]. Defendant evaluates its clients' timeshare obligations, and determines the course of action for cancelling undesirable timeshare contracts. Id. at 7. Ancillary to the timeshare cancellation business, Defendant also offers information about protecting credit scores, avoiding bankruptcy, and managing debt. Id.

In March 2014, Defendant purchased its first paid advertisement on Google. Suppl. Micallef Decl. ¶ 14 [#45]. In 2014 and 2015, Defendant added additional advertising campaigns. Id. In March 2016, Defendant retained Fill in the Blank to improve Defendant's search engine

3

optimization strategy. Id. ¶ 15; Decl. Cory Hubbell Supp. Def.'s Opp'n Mot. Prelim. Inj. ("Hubbell Decl.") ¶¶ 2, 4 [#44]. Since March 2016, Defendant has paid Fill in the Blank $65,000 in fees, and has paid Google $1,855,620.11 in advertising fees. Suppl. Micallef Decl. ¶ 15 [#45]. Defendant is currently spending approximately $250,000 per month for advertising on Google. Id.

II.  Standard

A preliminary injunction is an "extraordinary and drastic remedy . . . ." Munaf v. Geren, 553 U.S. 674, 689 (2008). A party seeking a preliminary injunction must show "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015); Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The likelihood of success on the merits and irreparable harm weigh heavily in the analysis and these factors are assessed in relation to one another. See W Holding Co., Inc. v. AIG Ins. Co., 748 F.3d 377, 383 (1st Cir. 2014); Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011); Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 42-43 (1st Cir. 2010). "[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief." E.E.O.C. v. Astra U.S.A. Inc., 94 F.3d 738, 743 (1st Cir. 1996). The burden of proof on all factors is on the movant. Esso Std. Oil Co. (Puerto Rico) v. Monroig–Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

A.  **Likelihood of Success on the Merits**

To succeed on a claim of trademark infringement, Plaintiff must demonstrate that it owns a protectable mark and that Defendant's use of that mark will likely cause consumer confusion.

4

15 U.S.C. § 1125; Borinquen Biscuit Corp. v. M.W. Trading Corp., 443 F.3d 112, 116 (1st Cir. 2006) ("Before a party can succeed in an infringement action, it must demonstrate that its mark merits protection and that the allegedly infringing use is likely to result in consumer confusion."). Here, Plaintiff is able to show a slight likelihood of success on the merits.

### 1. Eligibility for Trademark Protection

Plaintiff can demonstrate that its marks "American Consumer Credit Counseling" and "ACCC" are registered. "Registration is 'prima facia evidence of the validity of the registered mark.'" Borinquen Biscuit Corp., 443 F.3d at 117. (quoting 15 U.S.C. § 1115(a)).

Defendant argues that Plaintiff's mark as a whole is generic[2] and therefore not entitled to protection. Generic terms "serve primarily to describe the products rather than identify their sources . . . ." Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 14 (1st Cir. 2008). Generic marks explain "what are you?" rather than answering the question "where do you come from?" Id. at 14.

Plaintiff's registration of the marks creates a rebuttable presumption that the mark is not generic. Colt Defense LLC v. Bushmaster Firearms, Inc., 486 F.3d 701, 705 (1st Cir. 2007). This presumption may be overcome, however, where "an alleged infringer demonstrates genericness by a preponderance of the evidence." Id.; see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 194 (1985) ("[A] registered mark may be canceled at any time on the grounds that it has become generic.").

In evaluating a mark's generic-ness, the court must determine "the primary significance of the phrase to the relevant public," 15 U.S.C. § 1064(3); Colt Defense LLC, 486 F.3d at 709,

---

[2] American Consumer Credit Counseling is a composite mark and the court considers the mark as a whole, as "a complete phrase may signify something different than the sum of its parts." Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 18-19 (1st Cir. 2008).

5

considering evidence such as "(1) consumer surveys; (2) the use of the term in media publications; (3) use of the term by competitors in the industry; (4) purchaser testimony concerning the term; and (5) the plaintiff's use of the term," Boston Duck Tours, LP, 531 F.3d at 18. "The preferred form of proof includes direct evidence (such as consumer surveys) suggesting that the average purchaser actually regards the mark as merely descriptive of the plaintiff's product." Borinquen Biscuit Corp., 443 F.3d at 118 n.4. Neither party has provided the court with this preferred type of evidence.

Defendant has submitted printouts from the internet for searches for third party use of the phrase "American Consumer Credit Counseling" and similar variants. See Decl. Zachary C. Kleinsasser Supp. Def.'s Opp'n Pl.'s Mot. Prelim. Inj. ("Kleinsasser Decl.") Exs. A-B [#21-1, #22-2]. Plaintiff argues in response that other competitors are also improperly using Plaintiff's mark as a means of attracting Plaintiff's clients to their own websites, and that these printouts do not show legitimate third party use of "American consumer credit counseling" as a generic phrase. Pl.'s Reply Supp. Mot. Prelim. Inj. ("Pl.'s Reply") 4-6 [#37]. The printouts are ambiguous. One competitor uses the phrase "American Consumer Credit Counseling" at the top of its website (perhaps to direct traffic there as Plaintiff contends), but clearly identifies its own name – Aegis Debt Consolidation – and suggests the generic-ness of the name by referring to "American consumers" and the "average American Consumer" in the text. Kleinsasser Decl. Ex. B 12-13 [#21-2]. The website of another competitor – Credit Counseling Corp. – in contrast, could be read to identify (falsely) the source of the product, rather than to describe the product. There the term "American Consumer Credit Counseling Services," and its uncapitalized variant "American consumer credit counseling services" are arguably used as the name of the entity providing services, rather than the type of service – referring, for example, to "an alliance in

American consumer credit counseling . . . ." Id. at 14-15. Yet another competitor, CuraDebt, arguably uses the phrase – with the addition of the letter A at the beginning – as the source of the product. Its website states, for example, that "A American consumer credit counseling has helped" people and that "A American consumer counseling can reduce overall monthly debt . . . ." Id. at 20. The printouts and use of the term by competitors do not help resolve the question of generic-ness.

Plaintiff argues that it has spent millions of dollars in online advertising and marketing in connection with its marks, and that it is well known in the industry and is frequently quoted in national media. Trumble Decl. ¶ 8 [#7-1]. Plaintiff points to an extensive list of media mentions that are listed on its website as evidence supporting its claim that its mark and name are recognized in the industry. See Pl.'s Mem. Supp. 4 [#7]; http://www.consumercredit.com/about-us/media-mentions/2016-media-mentions.aspx.

Somewhat undermining Plaintiff's argument, however, is Plaintiff's own use of the mark. On Plaintiff's homepage, the phrase "American Consumer Credit Counseling" does not appear in a banner at the top identifying the organization. Instead, the banner is "ConsumerCredit.Com." Trumble Decl. Ex. 3 2 [#7-5]. Underneath that large banner in small print is "ACCC - The Credit Counseling Professionals." Id. Not until the consumer scrolls down to the bottom of the homepage is the phrase "American Consumer Credit Counseling" found, in small font, in three paragraphs which describe the nature of Plaintiff's business. Id. at 3-4. While Plaintiff's press releases use ACCC and American Consumer Credit Counseling, http://www.consumercredit.com/about-us/press-releases/2016-press-releases/, the fact that Plaintiff's own homepage does not feature the mark prominently undercuts its argument that the mark has strong brand recognition.

7

In sum, the court does not have sufficient evidence to determine the primary significance of the mark to the relevant public. Because Plaintiff has an incontestable mark, it is Defendant's burden to rebut the presumption of validity by a preponderance of the evidence. Although Defendant presented some compelling evidence that Plaintiff's mark is generic, at this stage Defendant has not rebutted by a preponderance of evidence the presumption that Plaintiff's incontestable mark "American Consumer Credit Counseling" is valid.

Defendant has also failed to provide sufficient evidence that the mark "ACCC" is generic. While Defendant provided evidence that the phrase "ACC" is used by other organizations which provide similar services to Plaintiff, Defendant has not provided evidence that any of these competitors use "ACCC." American Consumer Council, a non-profit membership organization dedicated to consumer education, advocacy and financial literacy, uses "ACC" in its logo, but not the full ACCC. Kleinsasser Decl. Ex. A 2 [#21-1]. Consumer Credit of America is another non-profit organization that also provides debt relief to clients. Id. at 5. American Credit Counseling Services, a non-profit that provides consumer credit counseling services uses "ACCS" as its acronym. Id. at 6. Although these examples provide evidence of companies that use similar acronyms, Defendant does not provide any examples of a company using the same mark, and there is no evidence in the record to support a finding that ACCC is descriptive of a type of service or has become a stand-in for the genus of services provided by Plaintiff. Thus, Defendant has failed to overcome the rebuttable presumption that "ACCC" is an incontestable mark warranting protection.

      2.    *Consumer Confusion*

The second element to a determination of likelihood of success on the merits is whether Defendant's use of the mark creates consumer confusion. Likelihood of confusion is analyzed

8

using eight non-exclusive factors, and requires a comparison of the allegedly infringing mark with the Plaintiff's protected mark. Courts will consider "(1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark." Oriental Fin. Group, Inc. v. Cooperativa de Ahorro y Crédito Oriental, 832 F.3d 15, 25 (1st Cir. 2016). "A proper analysis takes cognizance of all eight factors but assigns no single factor dispositive weight." Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 10 (1st Cir. 2012) (quoting Borinquen Biscuit Corp., 443 F.3d at 120) (internal quotation marks omitted). The evidence ultimately must demonstrate a substantial likelihood of confusion, not a mere possibility. Id. at 12 (citing Star Fin. Servs, Inc v. AASTAR Mortg. Corp, 89 F.3d 5, 10 (1st. Cir. 1996)).

      a.    Similarities of the marks

Here, both marks use the exact same phrase "American Consumer Credit," and both marks use the first three letters "ACC." See Dorpan, S.L. v. Hotel Meliá, Inc., 728 F.3d 55, 66 (1st Cir. 2013) (marks are "essentially identical for trademark purposes" when both have the same word as their "most salient word").

      b.    Similarity of goods

While the main services of the parties do not directly overlap, there is some overlap in the ancillary services and in the customer base of each company. Defendant states that it does not provide credit counseling services, instead it maintains a narrow focus on customers who seek to void their time share contracts. Defendant admits that it will occasionally offer information to clients about protecting credit scores, avoiding bankruptcy, managing debt and retirement

9

planning, but this is only ancillary to its main business function. Def.'s Opp'n 7 [#20]. Plaintiff points to a video recording of an interview Micallef gave on January 5, 2017, in which he stated, "I've had American Consumer Credit since 2004, I helped the people with all types of financial problems, restructuring debts and things of that nature," to show that Defendant has offered products in the same areas as Plaintiff. Third Suppl. Decl. Katie Ross Supp. Mot. Prelim. Inj. ("Third Ross Decl.") ¶ 4-5 [#56]; Evan Carmichael, There is No SUCCESS Without Risk ft. @aconsumercredit, Youtube, 1:28 (Jan 5, 2017), https://www.youtube.com/watch?v=yBwBEoYSGTE ("Micallef Interview"). This evidence is undercut, however, by the fact that the interview itself and the accompanying biography of Micallef focus on his success specific to helping customers cancel time share contracts. Id. When viewed in context, this interview underscores Defendant's focus on time share customers. Thus, this factor weighs in favor of Defendant.

    c.  Relationship between the parties' channels of trade, relationship between the parties' advertising, and classes of prospective purchasers

The relationship between the channels of trade, the parties' advertising, and the classes of prospective purchasers are interrelated, and may be treated together. Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 488 (1st Cir. 1981). The First Circuit has noted that "any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark." Peoples Federal Sav. Bank, 672 F.3d at 14 (quoting Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996)). As noted above, there is some overlap in the two business, but their core services are different. Plaintiff argues that the areas of overlap – education and financial planning, retirement planning, credit counseling and bankruptcy counseling – are all aimed at the same general

consumer population and are advertised the same way on the internet.[3] Plaintiff again points to the video interview Micallef recently gave and to his specific statements about advertising and communication with consumers. Third Ross Decl. ¶¶ 4-5 [#56]; Micallef Interview 6:15, 7:03. As described above, this evidence does not substantially change the court's analysis when viewed in context.

Plaintiff also argues that because the customer base is similar, there is a strong likelihood of confusion. Defendant refutes this argument, and states that it has specifically geared its advertising efforts to avoid Plaintiff's customers. Defendant's affiant Cory Hubbell, the Chief Operating Officer of Fill in the Blank, Defendant's web and digital strategy company, states that the customers targeted by Defendant are different from Plaintiffs. Hubbell Decl. ¶ 7-8 [#44]. According to Hubbell, individuals with significant debt, credit problems, student loans, or large balances on credit cards, or who are on the verge of bankruptcy are not the customers targeted by Defendant because these customers cannot pay Defendant's fees. Id. Hubbell states that Defendant has never purchased keywords for internet searches that include the terms "debt counseling," "bankruptcy," "debt consolidation," "financial planning," "housing," "student loans," "financial counseling," "financial education," or "debt management plan." Id. ¶ 9. Hubbell also states that Defendant's advertising needs to be targeted toward its own customers, because when a customer of Plaintiff inadvertently clicks through an ad on Google, Defendant has to pay for that user click. Id. ¶ 12. Hubbell also states that Defendant specifically chose to

---

[3] Plaintiff points to Defendant's Twitter account as evidence that Defendant makes references to budgeting and financial planning in its twitter feed. Looking at the full Twitter posts, however, reveals that each Twitter post cited by Plaintiff is framed in reference to timeshares, and not budgeting or financial planning generally. See Trumble Decl. Ex. 43 [#7-45].

avoid having its ads appear on a Google search page when the consumer types "American Consumer Credit Counseling." Id. ¶ 15.

Defendant's current website focuses almost exclusively on timeshares, and states in large type that its service is to "cancel timeshare contracts." Kleinsasser Decl. Ex. D [#21-4]. While there may be some overlap in the ancillary business of Defendant and Plaintiff, as well as the customers of each company, based on the evidence presented, these factors weigh in favor of Defendant. Defendant remains a timeshare counseling company, and Plaintiff remains a credit counseling company. Although some consumers might have some confusion based on an internet search, the companies remain sufficiently distinct.

### d. Evidence of actual confusion

Evidence of actual confusion is "highly probative of the likelihood of confusion." Dorpan, S.L., 728 F.3d at 67 (internal quotation marks omitted). Plaintiff has provided evidence of one case of actual confusion. On October 25, 2016, a customer mistakenly posted a Better Business Bureau complaint against Plaintiff, when the customer was discussing Defendant. Trumble Decl. ¶ 15 [#7-1]; Trumble Decl. Ex. 55 [#7-57]. Plaintiff also points to some confusion stemming from misdirected emails, including sixty emails from Defendant's customers that were mistakenly misdirected to Plaintiff. Trumble Decl. ¶ 14 [#7-1]; Trumble Decl. Exs. 6-28, 54 [#7-8–#7-30, #7-56]; Second Suppl. Decl. Katie Ross Supp. Pl.'s Mot. Prelim. Inj. ("Second Ross Decl.") ¶ 2 [#38]; Second Ross Decl. Exs. 69-73 [#38-1–#38-5]; Third Ross Decl. ¶ 2 [#56]; Third Ross Decl. Exs. 87-95 [#56-1–#56-9]; Fourth Suppl. Decl. Katie Ross Supp. Pl.'s Mot. Prelim. Inj. ("Fourth Ross Decl.") ¶ 2 [#60].

Plaintiff's evidence of a customer posting a bad review of Defendant on Plaintiff's Better Business Bureau account points to both actual confusion and the harm to Plaintiff from

confusion between the two companies. The misdirected emails, however, do not directly support Plaintiffs' confusion argument. Plaintiff has not presented evidence of customers who used Defendants' service under the misbelief that they were using Plaintiff's services, and all of the misdirected emails were Defendant's customers, not Plaintiffs.[4] Thus, while the evidence of one case of actual confusion weighs slightly in favor of Plaintiff, this evidence is not dispositive.

Plaintiff has not presented evidence on whether there was any confusion based on Defendant's use of "ACC." Without evidence demonstrating confusion based on ACC, this factor weighs in favor of Defendant.

      e.    Defendant's intent in adopting its mark

Plaintiff argues that Defendant is attempting to trade on its name and reputation by using "American Consumer Credit" as its name. Plaintiff argues that Defendant is using a name which does not accurately describe its business, and Plaintiff avers that this incongruity speaks to the fact that Defendant is seeking to capitalize on Plaintiff's mark. Plaintiff also points to Defendant's Facebook and Yelp pages which claim of an A+ business rating, as evidence that Defendant is intentionally trying to confuse potential customers. Compl. ¶ 32 [#1].

Defendant, however, provided Micallef's sworn testimony that when he founded American Consumer Credit in 2004, he was unaware of Plaintiff. Micallef Decl. ¶ 2 [#22] Micallef further avers that while his fictitious name registration for American Consumer Credit expired in 2009, he used the name again in conjunction with a website, "consumeraide.org"

---

[4] Going forward, even this misdirection is likely to be reduced. Defendant's information email address was info@aconsumercredit.com while Plaintiff's information address is info@consumercredit.com. Since receiving Plaintiff's complaint, Defendant has changed its information email to timeshareinfo@aconsumercredit.com and has updated marketing and client communication materials to reflect this change. Hubbell Decl. ¶ 17 [#44]; Second Suppl. Decl. Dana Micallef Supp. Def.'s Opp'n Pl.'s Mot. Prelim. Inj. ¶¶ 3-6 [#57].

which he launched in 2012. Suppl. Micallef Decl. ¶ 11 [#45]. He stated that he believed the name "would be attractive to potential clients." Id. Micallef contends that he does not target Plaintiff's customers because he is a for-profit enterprise focused on time share clients, and that Plaintiff's client cannot afford his services and do not seek his specific services. Id.

Although Defendant's explanations are somewhat contradictory, on this record the court cannot find at this stage that this factor favors either party.

      f.      Strength of Plaintiff's mark

The strength of a mark is determined by "its tendency to identify the good sold under the mark as emanating from a particular [] source." Dorpan, S.L., 728 F.3d at 68 (quoting Eli Lilly & Co. v. Nat. Answers, Inc., 233 F.3d 456, 464 (7th Cir. 2000)). As discussed earlier, from the evidence before the court at the preliminary injunction stage, the mark "American Consumer Credit Counseling" is weak. While Plaintiff has used its marks for twenty years, and no other companies have registered for the mark, the phrase "American consumer credit counseling" is used by competitors. Furthermore, the court has no evidence before it to determine whether relevant consumers choose Plaintiff because of its marks, and Plaintiff does not prominently display the mark on its own homepage. Similarly, as discussed above, Plaintiff's mark ACCC, also appears weak. In sum, based on the limited evidence before the court, Plaintiff has not demonstrated that its marks are strong.

      g.      Consideration of the factors as a whole

A review of the evidence presented reveals that this is a close case. While the marks are similar, this factor does not weigh heavily in Plaintiff's favor where the parties' main business services do not directly compete in the same channels of trade. Plaintiff offers consumer debt counseling and education services. Defendant's business, by contrast, focuses on timeshare

clients. Although there may be some overlap between the two, as some of Defendant's clients may seek information about protecting credit scores, avoiding bankruptcy, managing debt, and retirement planning, the core businesses remain distinct. Thus while "similarity of the marks is highly salient where . . . the parties sell similar goods, via similar channels of trade and similar modes of advertising, and compete for similar consumers," because the marks do not directly compete, the similarity of the marks weighs only marginally in Plaintiff's favor. See Oriental Fin. Group, Inc., 832 F.3d at 26.

And while Plaintiff has established valid, incontestable trademarks, the evidence does not suggest that the marks are strong. While there has been some confusion between the two parties, the evidence of that confusion is slight given the volume of consumers using both parties' services. In sum, there is some indication on this record that Plaintiff may ultimately prevail on the merits, but not a substantial likelihood of success on the merits at this stage.

### B. Likelihood of Irreparable Harm Absent Interim Relief

"The [Supreme] Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." Voice of the Arab World, Inc., 645 F.3d at 32 (quoting Weinberger v. Romero-Barceló, 456 U.S. 305, 312 (1982)); Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) ("In most cases . . . irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief."). Plaintiff argues that its reputation is vitally important to its business. Plaintiff states that it is "approved by the U.S. Department of Justice Executive Office of the United States Trustee and several federal bankruptcy courts to provide pre-bankruptcy and post-bankruptcy debtor education in 49 states, and by the U.S. Department of Housing and Urban Development to perform pre-purchase and post-purchase housing counseling, debt

15

management, mortgage delinquency and default resolution, homebuyer education programs, as well as home equity conversion mortgage counseling." Trumble Decl. ¶ 6 [#7-1]. Plaintiff has presented evidence that confusion could cause irreparable harm Plaintiff's business reputation. Notably, Plaintiff retains an A+ rating with the Better Business Bureau, but Defendant has rapidly declined to an F rating during the course of these proceedings. Fourth Ross Decl. ¶ 3 [60]. Plaintiff has also provided evidence of multiple complaints filed by customers describing Defendant as a "fraud" and a "scam." Trumble Decl. Ex. 38 5-12 [#7-40].

While the Plaintiff has established that there is a potential for harm, it has not established that the harm it may suffer is immediate or that the extraordinary remedy of a preliminary injunction is warranted at this stage. The two companies have existed since at least 2014 and the fact that both companies have existed for some time without diminishment to Plaintiff's reputation underscores that the harm it may suffer is not immediate. See Voice of the Arab World, Inc., 645 F.3d at 35 ("[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." (quoting Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995)) (internal quotation marks omitted)). Additionally, Defendant's website www.consumeraide.org is no longer active, and its current website describes Defendant's services exclusively in the timeshare context. Kleinsasser Decl. Ex. D [#21-4]; www.aconsumercredit.com.

Defendant's increased advertising efforts may escalate the fear of irreparable harm, but based on the record before it, the court does not find a preliminary injunction merited. See generally Winter, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary

16

remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

C.  **The Balance of Equities**

Plaintiff must show that the injury that it is likely to incur will outweigh the harm that granting the injunctive relief would inflict on Defendant. Winter, 555 U.S. at 24. Plaintiff argues that an injunction would restore its right to be free from confusion and a tarnished reputation, and that an injunction is justified given the decades Plaintiff has used and invested in its marks.

Plaintiff has not shown, however, that the continuation of the status quo will present an immediate threat of irreparable harm that outweighs the potential harm to Defendant. Both companies have invested significant resources in advertising and marketing. Issuing a preliminary injunction estopping Defendant from the continued benefit of its advertising efforts when there has not been a showing of likely success on the merits is unjustified. See Polar Corp. v. PepsiCo, Inc., 789 F. Supp. 2d 219, 240 (D. Mass. 2011) ("Rebranding costs should be balanced against the harm to plaintiff if an injunction does not issue."). A preliminary injunction remains an "extraordinary remedy," and at this time, reputational harm to Plaintiff is speculative, whereas harm to Defendant in rebranding is concrete. See generally Winter, 555 U.S. at 22. While the court acknowledges that Defendant's continued advancement of its advertising efforts could increase the likelihood of confusion and potential reputation diminishment, based on the current record, the court finds the balance of equities to be evenly balanced between the two parties.

D.  **The Public Interest**

Plaintiff presented evidence that some customers may have mistakenly relied on Plaintiff's A+ Better Business Bureau rating when they chose Defendant's business. Trumble

Decl. Ex. 38 6 [#7-40]; Compl. ¶ 32 [#1]. Plaintiff has also shown that Defendant's Better Business Bureau Rating has declined from a C- to an F since December 2016 as a result of customer complaints and negative reviews. Fourth Ross Decl. ¶ 3 [#60]. Thus, there is evidence of a continuing potential harm that future consumers will mistake Plaintiff's A+ business rating for that of Defendant's. Plaintiff has also shown that emails which were misdirected often contained confidential information concerning costumer's financial interests. The interests of the public, therefore, weigh in favor of an injunction.

III.     Conclusion

Despite demonstrating that the interests of the public weigh in favor of a preliminary injunction, Plaintiff has not demonstrated a substantial likelihood of success on the merits, nor a clear likelihood of irreparable harm warranting the extraordinary remedy of an injunction at this stage. But see CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 620-21 (1st Cir. 1995) (observing that the reason "immediate appeal of an order refusing a preliminary injunction" is allowed, is "to prevent irreparable harm to a litigant who, otherwise, might triumph at trial but be left holding an empty bag"). For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction [#6] is DENIED.

　　　　IT IS SO ORDERED.


Date: April 27, 2017                                         /s/ Indira Talwani
　　　　　　　　　　　　　　　　　　　　　　　 United States District Court